Patsy AYALA, et al., Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 82–S–1907.

United States District Court,
D. Colorado.

Aug. 7, 1991.

Macon Cowles, Jean Dubofsky, David Griffith, Williams & Trine, Boulder, Colo., for plaintiffs.

Robin Smith, Stephen E. Handler, U.S. Dept. of Justice, Torts Branch, Civ. Div., Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

SPARR, District Judge.

THIS MATTER came before the court for trial on May 6, 1991 in Grand Junction, Colorado. The trial was on the issues of liability only. The damage issues were bifurcated for later trial if appropriate. Also before the court is Plaintiffs' Motion to Amend Complaint to Conform to the Evidence, filed May 24, 1991.

## I. PROCEDURAL BACKGROUND

In light of the extensive history of this case, a brief summary of its procedural background is appropriate. Because the United States is the sole remaining defendant, the court will limit the background discussion to matters involving the claims against the United States.

The original complaint arose out of a methane and coal dust explosion which occurred on April 15, 1981 in the Dutch Creek No. 1 Mine, an underground coal mine near Redstone, Colorado. The mine was owned and operated by Mid–Continent Coal and Coke Company (Mid–Continent). Fifteen miners were killed in the explosion. The Plaintiffs are the families of some of the deceased miners. The original complaint was filed in Pitkin County, Colorado on October 13, 1982, alleging wrongful death against parties involved in the manufacture and service of the equipment used in the mine. On November 10, 1982, the case was removed to the United States District Court for the District of Colorado based upon diversity of citizenship.

On May 13, 1983, Plaintiffs filed an Amended Complaint adding, in the Thirteenth Claim for Relief, allegations of negligence against the United States by the Mine Safety and Health Administration (MSHA) for failure to exercise reasonable care in connection with mandatory safety inspections. The United States filed its Answer on August 31, 1983. On October 4, 1983, this Civil Action No. 82–JM–1907 was consolidated with 83–JM–580, an action naming the United States for negligent failure to inspect and detect improper installation of a mine lighting system, among other things.

On October 31, 1983, the United States moved to dismiss for lack of jurisdiction

over the subject matter and failure to state a claim upon which relief could be granted. The United States argued that there is no actionable tort duty upon which the Plaintiff can base recovery. The United States further argued that even if there were such a duty, the Plaintiffs' claims based on any acts or omissions by MSHA inspectors are barred by 28 U.S.C. § 2680(a), the discretionary function exception to the Federal Tort Claims Act (FTCA).

On February 9, 1984, Judge John P. Moore entered an order on several pending motions. Pursuant to Fed.R.Civ.P. 12(b)(6), Judge Moore dismissed all claims then pending against the United States, concluding that the inspection procedures of the Mine Safety Act do not create a tort duty on the part of the Government toward the Plaintiffs. *Ayala By and Through Ayala v. Joy Mfg. Co.*, 580 F.Supp. 521, 525–26 (D.Colo.1984). Since he concluded there was no tort duty, he declined to determine whether the inspection process fell within the discretionary function exception of the FTCA.

On May 3, 1984, Plaintiffs sought leave to file a Second Amended Complaint alleging a Ninth Claim for Relief entitled "Active Negligence" and a Tenth Claim for Relief entitled "Negligent Inspection." By orders of Magistrate Donald E. Abram on May 21, 1984 and Judge Moore on June 25, 1984, the Plaintiffs were allowed to add a claim based on a negligent "non-optional instruction" relating to the wiring of the lights. Plaintiffs were not allowed to reassert their claim for Negligent Inspection. Plaintiffs filed their Second Amended Complaint on May 30, 1984. The United States answered the Second Amended Complaint on July 19, 1984.

On November 7, 1984, the United States again moved to dismiss on the grounds that the court lacked jurisdiction over the subject matter and that the complaint failed to state a claim upon which relief could be granted. This motion was based on the second prong of the United States' earlier motion which was not previously decided by Judge Moore, specifically, that the Plaintiffs' claim is barred by the discretionary function exception to the FTCA. On May 9, 1985, Judge Moore determined that the acts of the MSHA inspectors fell within the discretionary function exception and dismissed Plaintiffs' Second Amended Complaint as against the United States. *Ayala v. Joy Mfg. Co.*, 610 F.Supp. 86 (D.Colo. 1985), *rev'd*, 877 F.2d 846 (10th Cir.1989).

Plaintiffs appealed that dismissal to the Tenth Circuit. On June 16, 1989, in an opinion by Judge McKay, the Tenth Circuit reversed Judge Moore's Rule 12(b)(6) dismissal and remanded the case to the District Court. *Ayala v. Joy Mfg. Co.*, 877 F.2d 846 (10th Cir.1989). The Tenth Circuit reasoned, quoting from *Berkovitz v. United States*, 486 U.S. 531, 547–48, 108 S.Ct. 1954, 1964, 100 L.Ed.2d 531 (1989):

> "Because petitioners may yet show ... that the conduct challenged here did not involve the permissible exercise of policy discretion, the invocation of the discretionary function exception to dismiss petitioners' ... claim was improper. *Berkovitz*, 108 S.Ct. at 1964. We conclude that plaintiffs have pled sufficient facts to withstand a motion to dismiss in light of *Berkovitz*. We therefore reverse the district court's grant of defendant's motion to dismiss and remand for further proceedings consistent with this opinion." *Ayala*, 877 F.2d at 849.

On October 30, 1989, Plaintiffs sought leave to file their Third Amended Complaint based on additional facts and circumstances learned during discovery. When the United States objected, the Plaintiffs tendered a revised Third Amended Complaint containing a First Claim for Relief for "Active Negligence" and a Second Claim for Relief for "Negligent Failure to Inspect." Plaintiffs alleged that the Defendant's failure to enforce detected violations of mandatory safety requirements is not protected by the discretionary function exception to the FTCA because the law creates liability for disregarding mandatory regulatory requirements.

On March 13, 1990, Magistrate Abram granted the Plaintiffs permission to file their revised Third Amended Complaint, with some modifications. Magistrate

Abram concluded that the Second Claim for Relief for "Negligent Failure to Inspect" merely attempted to reassert the negligence claim that had been dismissed previously by Judge Moore. Magistrate Abram re-named the Second Claim for Relief "Failure to Enforce Regulation" so that the Second Claim for Relief would allege a knowing failure to enforce the regulations, not negligence. He also struck paragraph 8 of that claim because it referred to negligence. Magistrate Abram noted that Judge Moore had never been presented the issue of a knowing or intentional failure by the inspectors to enforce mine regulations. On April 18, 1990, Judge Weinshienk affirmed Magistrate Abram's Order.

On April 26, 1990, this action was reassigned to Judge Daniel B. Sparr. On July 5, 1990, the United States moved to dismiss or for summary judgment on the grounds that the Plaintiffs' claims are barred by the misrepresentation exception to the FTCA and that the Second Claim for Relief is not actionable under the FTCA because it fails to state a duty under Colorado law. On February 27, 1991, this court issued a Memorandum Opinion and Order denying the Defendant's motion to dismiss. On March 14, 1991, the United States moved for reconsideration of that Order regarding only the Second Claim for Relief. On April 11, 1991, the court granted the Defendant's Motion to Reconsider, reinstated the motion to dismiss as to the Second Claim for Relief only, and advised the parties that the issue would be addressed at the trial commencing May 6, 1991.

On May 6, 1991, trial commenced on the issues presented in the Third Amended Complaint. At the close of the Plaintiffs' case, the United States moved for dismissal pursuant to Fed.R.Civ.P. 41(b) on the grounds that the discretionary function exception bars Plaintiffs' claims and that the Second Claim for Relief is not actionable under the FTCA because it fails to state a duty owed under Colorado law. The court declined to render judgment on those issues until the close of all the evidence. At the close of all the evidence, the United States renewed its motion to dismiss the Plaintiffs' claims.

On May 24, 1991, Plaintiffs moved pursuant to Fed.R.Civ.P. 15(b) to amend their complaint to conform to the evidence and tendered a Fourth Amended Complaint.

Because the case has been pending since 1982 and the court, counsel, and parties have expended innumerable hours and seven trial days, the court advised counsel that it would make extensive findings on the evidence notwithstanding the outcome of the legal issues in the case. Accordingly, the court makes the following Findings of Fact, Conclusions of Law, and Order.

## II. MOTION TO AMEND COMPLAINT TO CONFORM TO THE EVIDENCE

Plaintiffs seek to amend their complaint pursuant to Fed.R.Civ.P. Rule 15(b) to reinsert the previously stricken paragraph 8 of the Second Claim for Relief in the Second Amended Complaint. Plaintiffs wish to amend their complaint to conform to the evidence because the evidence at trial addressed not only a knowing or intentional failure to enforce mandatory MSHA regulations, but a negligent failure as well. Defendant objects to such an amendment because (1) the claim for negligent failure to enforce MSHA regulations is barred by the law of the case; (2) the attempted amendment is merely an objection to Magistrate Abram's March 13, 1990 Order wherein he struck paragraph 8 of the Second Claim for Relief and restricted that claim to a knowing or intentional failure to enforce the regulations; and (3) the issue of negligent failure to enforce mandatory safety requirements was not tried by express or implied consent.

Pursuant to Fed.R.Civ.P. 15(b),

"When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.... If the evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and

the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits."

■ A motion to amend the pleadings to conform to the evidence rests in the sole discretion of the trial court. *Grand Light and Supply Co. Inc. v. Honeywell, Inc.*, 771 F.2d 672, 680 (2d Cir.1985); *Hardin v. Manitowoc–Forsythe Corp.*, 691 F.2d 449, 457 (10th Cir.1982). Leave to amend may properly be denied for several reasons, such as undue prejudice to the opposing party and futility of amendment. *Perkins v. Spivey*, 911 F.2d 22, 34 (8th Cir.1990); *Moore v. Kayport Package Exp. Inc.*, 885 F.2d 531, 538 (9th Cir.1989).

■ The law of the case bars a claim for negligent failure to enforce MSHA regulations. Judge Moore ruled on February 9, 1984 that the allegations of negligent failure to exercise reasonable care and skill in conducting mandatory safety inspections contained in the Thirteenth Claim for Relief of the May 13, 1983 Amended Complaint did not create a tort duty. *Ayala*, 580 F.Supp. at 525–26. Judge Moore dismissed the Thirteenth Claim. Plaintiffs did not appeal that dismissal. Although Plaintiffs attempted to re-assert such a claim in the Second Amended Complaint, Magistrate Abram, affirmed by Judge Moore, did not permit re-assertion of a negligent inspection claim and limited the Plaintiffs to a claim based on a negligent "non-optional instruction" theory, relating to Jack Marshall's advice to Brad Bourquin. Plaintiffs did not appeal that limitation.

Plaintiffs again tried to assert such a claim in their Third Amended Complaint. But Magistrate Abram, affirmed by Judge Weinshienk, did not permit re-assertion of a claim for negligent failure to inspect. He allowed the Plaintiffs to pursue a claim for knowing failure to enforce mandatory safety regulations. He struck paragraph 8 of the Second Claim for Relief because it again stated a claim for negligent failure to enforce mandatory safety requirements, which claim was barred by the law of the case that there was no tort duty on the part of the United States. Plaintiffs did not appeal that order. The Second Claim for Relief was then tried to this court on the theory of a knowing or intentional failure to enforce safety regulations.

The Defendant has never impliedly or expressly consented to trial on this issue. The United States has moved at every step to dismiss the claims for negligent failure to inspect or enforce, and the claims of that nature have been dismissed. Evidence of negligent failure to enforce mandatory MSHA regulations that appeared at trial could have been relevant to the issue of knowing or intentional failure to enforce mandatory MSHA regulations. When evidence claimed to show trial of an issue by consent is relevant to a separate issue already in the case, it would be unjust to the opposing party to consider a new theory of recovery after trial is complete. *Cook v. City of Price, Carbon County, Utah*, 566 F.2d 699, 702 (10th Cir.1977). The Defendant did not consent to this issue not presented by the pleadings entering the case at trial.

In light of the law of the case, it is not appropriate to re-insert the issue of negligent failure to enforce regulations just because the evidence at trial may have fallen short of establishing a knowing or intentional failure to enforce regulations. The Plaintiffs never appealed the limitation of their Second Claim for Relief to the issues of knowing or intentional failure to enforce regulations. The United States did not consent to trial on the issue of negligent failure to enforce mandatory regulations. The requested amendment would prejudice the Defendant in maintaining its defense upon the merits and should not be allowed. Accordingly, the Plaintiffs' Motion to Amend Complaint to Conform to Evidence is DENIED.

## III. FINDINGS OF FACT

### A. Plaintiffs' First Claim for Relief

The Plaintiffs' First Claim for Relief alleges that an MSHA employee negligently provided technical assistance concerning

the wiring of add-on lights to mining equipment.

A continuous miner mined coal in the Dutch Creek No. 1 Mine. The continuous miner mechanically cut into a seam of coal in an underground tunnel as it proceeded slowly forward. The coal broken loose by the continuous miner was moved by conveyor belt or other device back into the tunnel and transported to the surface. As the continuous miner moved forward, it occasionally encountered large pockets of methane gas in the seam of coal. These pockets of methane gas caused what were known as "outbursts." During an outburst, the area in the tunnel around the continuous miner became filled with highly explosive methane gas. Because of the great quantity of methane gas liberated in the Dutch Creek No. 1 Mine (measured at 1,612,000 cubic feet of methane in 24 hours in January of 1981), the mine was designated a hazardous mine under 30 U.S.C. § 813(i). Pursuant to § 813(i), Dutch Creek No. 1 Mine was on a five-day spot inspection schedule and was assigned a resident inspector.

When the methane gas content in the underground tunnel reaches a level of two percent or greater, 30 C.F.R. § 75.313 requires that all electrical equipment, including the continuous miner, be automatically de-energized by a methane monitor. De-energization is imperative to prevent sparks which, in the presence of a high concentration of methane gas, would cause an immediate explosion. When the methane monitor detects concentrations of methane of two percent (2%) or greater in the surrounding air, it should de-energize the continuous miner by interrupting the power at the continuous miner's control circuit. Only the main power circuit and the methane monitor circuit remain energized so that the methane monitor can continue to operate.

On October 1, 1976, MSHA promulgated standards for illumination in underground coal mines. 30 C.F.R. §§ 75.1719 through 75.1719–4. The effective date of illumination standards, originally April 1, 1978, was changed to July 1, 1978. It was contemplated that lighting systems would be installed on the self-propelled continuous mining equipment.

In order to comply with this July 1, 1978 deadline, Mid–Continent ordered from the McJunkin Corporation (McJunkin) certain lighting "packages" for installation on Mid–Continent's continuous mining machines. The McJunkin lighting packages had been pre-approved by MSHA. Addition of the lights to the mining machines constituted a field modification of underground mining equipment that required MSHA approval of a field modification application and MSHA inspection of the modified equipment before use of the equipment in an underground mine was allowed. (Direct testimony of Jack Smith; direct testimony of Bill Craft).

In March of 1978, Brad Bourquin was employed as a mining engineer by Mid–Continent. He was assigned to install the add-on lights to comply with MSHA standards. Bourquin, with the assistance of a McJunkin field technician, completed an application for field modification for the installation of McJunkin lights on a particular Joy Manufacturing Company continuous miner, Serial No. 2228 (Joy 12CM 2228), which at the time was operating in the Bear Creek No. 4 Mine (Plaintiffs' Exhibit 8). The application prepared by Bourquin included a wiring diagram showing how the lights would be wired to the Joy 12CM 2228. (Exhibit 15 page 5).

Jack (John) Marshall was a coal mine electrical inspector employed by MSHA in the office in Price, Utah. The evidence shows that on or about June 9, 1978, Marshall assisted Bourquin in preparing a revised application for field modification for the Joy 12CM 2228 (Plaintiffs' Exhibit 9). On or about June 14, 1978, just as Marshall was ready to return to Price, Bourquin asked Marshall where to connect the add-on lights on the Joy 12CM 2228 to the power. The evidence shows that Marshall told Bourquin to obtain the power by connecting the add-on lights below the main circuit breaker.

The application which Bourquin submitted through Marshall for approval by

MSHA of the wiring included a diagram prepared by McJunkin to be used on all different types of mining machines. (Exhibit 15 page 5). That diagram did not specifically indicate where to connect the lights on the Joy 12CM 2228 to the power. Bourquin prepared a separate diagram with the advice from Marshall about where to connect the lights to the power. (Plaintiffs' Exhibit 7). Exhibit 7 showed the lights connected to the power upstream from, or above, the methane monitor relay. Bourquin's diagram was distributed to the electricians in all the Mid–Continent mines to show them how to wire the add-on lights to the continuous miners. Bourquin's diagram was not included with the application submitted for MSHA's approval.

On or about July 27, 1978, the add-on lights were installed on the Joy 12CM 2228. It was the first continuous miner at Mid–Continent on which the add-on lights were installed. It was MSHA's policy that field installations such as the one on 2228 were inspected the first time that the MSHA inspector was available to do so. (Direct testimony of Jack Smith; direct testimony of Bill Craft). On July 27, 1978, electrical inspector Jack Marshall inspected the Bear Creek No. 4 Mine where the Joy 12CM 2228 was then operating. (Exhibits 34A and 46).

Following the initial installation of the McJunkin lights on the Joy 12CM 2228 in the Bear Creek No. 4 Mine, the Joy 12CM 2228 was transferred to the Dutch Creek No. 1 Mine in approximately May of 1980. (See Exhibit 3 page 41). At that time, the McJunkin lights were still operating as initially installed.

The evidence shows that from the time of the installation of the McJunkin add-on lights on Joy 12CM 2228, no relevant changes were made to that miner until a light switch was installed just prior to the explosion. On or about April 6, 1981, Mid–Continent employees replaced the old cover plate on the explosion-proof compartment of the Joy 12CM 2228 with a cover plate containing a light switch so that the lights could be turned off and on manually.

After the explosion, the only electrical component that had visible evidence of methane ignition was the explosion-proof enclosure housing the light switch. Flame paths on the interior of the enclosure indicated methane ignition within the explosion-proof box. Laboratory tests taken later at MSHA laboratories in Pittsburgh, Pennsylvania indicated the presence of flame within the enclosure. The deactivation of the lights with this light switch caused an arc within the purportedly explosion-proof enclosure housing the light switch which arc set off the explosion. (See Exhibit 3 page 42).

The methane monitor performed properly when tested after the explosion. Both the test switch and the application of 2.3 percent methane air mixture caused activation of the methane monitor. However, the methane monitor was connected in such a manner that the activation of the methane monitor de-energized all of the electrical circuits on the equipment except the methane monitor itself, the incoming trailing cable, and the McJunkin lighting system installed on the machine. The investigators found that the lighting system was not installed in accordance with the approval granted by MSHA because the methane monitor contacts were not wired into the primary circuit of the lighting transformer so as to de-energize the lights. (Exhibit 3 page 40). The investigation revealed that the lights on the Joy 12CM 2228 were wired as illustrated in Bourquin's diagram (Exhibit 7).

The investigation after the explosion revealed that the light switch cover plate had been bolted down pinching a piece of wire in the flange of the explosion-proof compartment, leaving an opening in excess of .015 inch. (Exhibit 3). Federal standards allow a maximum opening of .004 inch. (Exhibit 3 at p. 41) The investigation of the explosion revealed that MSHA inspectors had examined the Joy 12CM 2228 on two occasions after the new cover was installed—on April 9 and on April 13, but did not detect any violations (see Exhibit 3).

Statements made by miners after the explosion indicated that the lights were kept on whenever the Joy 12CM 2228 was in operation. After the explosion the light

switch was found in the off position. The investigators believed that one of the two victims found near the light switch turned the lights off since the switch was found in the "off" position. Turning off the lights would break the circuit to the light fixtures which in turn created an intense arc inside the explosion-proof compartment housing the light switch. By the time the lights were turned off, methane had migrated into the compartment in an explosive concentration. Ignition of this methane inside the explosion-proof compartment apparently expelled flame through the opening and ignited the explosive atmosphere outside the compartment causing the explosion. The cause of the explosion was determined to be the switch on the Joy 12CM 2228. (See Exhibit 3 pp 46–47).

B. Plaintiffs' Second Claim for Relief

The Plaintiffs' Second Claim for Relief alleges that MSHA employees intentionally and/or knowingly failed to enforce federal mine safety standards.

MSHA inspectors made several inspections in Dutch Creek No. 1 Mine between 1978 and April 15, 1981. There were at least two and possibly as many as four MSHA employees who knew or should have known that the McJunkin lights on the Joy 12CM 2228 were wired to the power such that they did not shut off when the methane monitor de-energized the continuous miner.

Inspector Louis Villegos indicated that he was in the mine on or about January 16, 1981 through January 27, 1981 and that he observed that the lights on the Joy 12CM 2228 were not being de-energized by the methane monitor. Villegos stated that he paid particular attention to electrical matters because of the hazards of methane gas in the Dutch Creek No. 1 Mine. Villegos spoke to Jesus Meraz, the master mechanic in charge of the Dutch Creek No. 1 Mine, about the lights on the Joy 12CM 2228. Meraz told Villegos that the lights had always worked this way. Although Villegos was concerned that the lights on the Joy 12CM 2228 were in violation of MSHA regulations, Villegos was led by Meraz to believe that someone at MSHA had approved the operation of these particular lights. Villegos made note of the problem but did not issue a citation. He turned the problem over to Freeman Staples, his immediate supervisor, and took no further action. He stated that he left it up to Mr. Staples to determine what to do. Villegos reasoned that if someone at MSHA had approved the lights on the Joy 12CM 2228, it was not for him to write a citation. He asked Staples to determine whether anyone at the Price office had approved the condition of the lights on the Joy 12CM 2228.

After reporting the situation to Freeman Staples, Villegos made subsequent inspections of the Joy 12CM 2228, but he no longer activated the methane monitor test button to test the lights since he already knew they were not de-energizing as they should. Villegos did not wish to write any citations until the issue of approval of the lights on the Joy 12CM 2228 was resolved.

Freeman Staples, now deceased, testified by deposition. Staples indicated that he was aware that the lights on the Joy 12CM 2228 were remaining energized. He did not specifically remember who told him about the lights on the Joy 12CM 2228, but he was aware that the situation described by Villegos could be a violation of MSHA regulations. Staples did not order Villegos to issue a citation, but called Price, Utah and requested that the Price office send an electrical inspector to investigate.

Staples testified that sometime in late February of 1981, electrical inspector Marshall came to the mine to investigate. Staples testified that he asked Marshall if the lights were working properly and that Marshall responded "No, but they will be after McJunkin makes a little modification" (Staples deposition p 46). Staples understood that Marshall had taken care of the problem. Marshall, in his deposition testimony, denies he ever returned to the mine in February 1981 for the purpose of inspecting the Joy 12CM 2228. He also denies telling Staples that McJunkin would have to make a modification (Marshall September 14, 1990 deposition pp 44–49).

## IV. CONCLUSIONS OF LAW

### A. Plaintiffs' First Claim for Relief

The power for Joy 12CM miners with Bacharach methane monitor systems is interrupted at the primary side of the control circuit transformer, downstream of the connection to the power source that was illustrated in Exhibit 7. In order to de-energize the add-on lights on the Joy 12CM 2228, the lights had to be connected to the power source downstream from, or below, the methane monitor relay. The lights should have been connected so that the power would be cut off from the lights when the methane monitor cut off the power to the Joy 12CM 2228.

A review of Exhibit 7 reveals that it illustrates the add-on lights connected to the power source downstream from, or below, the main circuit breaker, but upstream from, or above, the methane monitor relay. Based upon Marshall's advice, Bourquin drew Exhibit 7 illustrating the add-on lights connected to the power source just below the main circuit breaker. With the connection in this location, in order to de-energize the lights when methane levels reached two percent (2%), a methane monitor slave relay would have been necessary. The add-on light packages purchased from McJunkin did not include a slave relay and Exhibit 7 did not illustrate a slave relay.

The add-on lights on the Joy 12CM 2228 were wired in accordance with Exhibit 7. An installation in accordance with Exhibit 7 would not de-energize the add-on lights when the methane monitor de-energized the Joy 12CM 2228. Therefore, the add-on lights would remain on even when the Joy 12CM 2228 was de-energized and in the presence of high concentrations of methane.

Marshall never saw Exhibit 7, but he recommended approval of Mid–Continent's application for field modification for the installation of the add-on lighting systems (Exhibit 66). Marshall knew that MSHA regulations required that the add-on lights be de-energized by the methane monitor, but the point at which he advised Bourquin to connect the lights did not accomplish that result.

Marshall knew that the continuous miner operating in Bear Creek No. 4 Mine (the first continuous miner wired with McJunkin add-on lights) was a Joy 12CM. But the evidence indicates that when Marshall advised Bourquin where to obtain the power for the add-on lights, Marshall must have been thinking of a Lee Norris continuous miner. Add-on lights on a Lee Norris miner wired substantially according to Exhibit 7 would have been de-energized because the methane monitor relay on a Lee Norris miner is upstream of the main circuit breaker. Marshall specifically recommended 20–amp fuses in the lighting circuit, but these 20–amp fuses were not appropriate in that location on the Joy 12CM 2228. The lights on the Joy 12CM 2228 did not de-energize because the power the methane monitor interrupted the power downstream from the point at which Marshall instructed Bourquin to connect the lights to the power source.

The court concludes that the information and instructions that Marshall provided to Bourquin regarding where to connect the add-on lights to the power supply were incorrect and inadequate. The instructions may have been correct had the lights been installed on a Lee–Norris continuous miner with different circuitry, but were not correct for the Joy 12CM 2228. Although Marshall did not prepare Exhibit 7 and never actually saw that drawing, it was as a result of his oral instructions to Bourquin on or about June 14, 1978 that Bourquin prepared Exhibit 7. The cause of the explosion was determined to be the switch on the Joy 12CM 2228, but had the McJunkin add-on lights been wired to the Joy 12CM 2228 correctly, the light switch on the Joy 12CM 2228 that ultimately caused the explosion would never have been necessary to install. The explosion was directly related to the improper connection of the add-on lights on the Joy 12CM 2228 to the power source, in accordance with Marshall's incorrect and inadequate advice to Bourquin.

Having made these findings, the court now addresses the motion by the United

States to dismiss the Plaintiffs' claims pursuant to Fed.R.Civ.P. 41(b) on the grounds that the discretionary function exception bars Plaintiffs' First Claim for Relief.

### 1. The Discretionary Function Exception to the FTCA

The FTCA provides a limited waiver of the sovereign immunity of the federal government. 18 U.S.C. § 1346(b). This waiver of immunity is limited, however, by what is referred to as the "discretionary function exception." The discretionary function exception relieves the United States of liability for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The discretionary function exception to the FTCA marks the boundary between the willingness of Congress to impose tort liability on the United States and its desire to protect certain governmental activities from exposure to suit by private individuals. *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808, 104 S.Ct. 2755, 2761, 81 L.Ed.2d 660 (1984). The discretionary function exception was designed to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Varig Airlines*, 467 U.S. at 814, 104 S.Ct. at 2765.

In 1988, the Supreme Court attempted to clarify the scope of the discretionary function exception in *Berkovitz v. United States*, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). In *Berkovitz*, the Court articulated a two-step procedure to guide courts in analyzing the scope of the exception. 486 U.S. at 536, 108 S.Ct. at 1958. First, a court must consider whether the conduct is a matter of choice for the acting employee or whether a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. *Berkovitz*, 486 U.S. at 536, 108 S.Ct. at 1958; *Zumwalt v. United States*, 928 F.2d 951, 953 (10th Cir.1991). If the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function to protect. *Berkovitz*, 486 U.S. at 536, 108 S.Ct. at 1958. Second, if the employee's conduct is the product of judgment or choice, the court must determine whether that judgment is the kind of judgment that the discretionary function exception was designed to shield. *Berkovitz*, 486 U.S. at 536, 108 S.Ct. at 1958; *Zumwalt*, 928 F.2d at 953. Under the second part of the test, a discretionary action or decision is only protected if based on considerations of public policy. *Berkovitz*, 486 U.S. at 537, 108 S.Ct. at 1959; *Zumwalt*, 928 F.2d at 953.

The *Berkovitz* Court found some of the claims in the case to be outside the scope of the discretionary function exception because the agency employees had violated specific statutory and regulatory directives which left no room for choice or judgment, 486 U.S. at 542–43, 108 S.Ct. at 1961–62, but the Court has left in tact the broad scope of the discretionary function exception. *See United States v. Gaubert*, —— U.S. ——, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991); *Redmon v. United States*, 934 F.2d 1151, 1154 (10th Cir.1991).

In *Gaubert*, the Court found that, if a regulation mandates particular conduct and the employee obeys that direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation. 111 S.Ct. at 1274. If the employee violates a mandatory regulation, there is no shelter from liability because there is no room for choice and the action is contrary to policy. However, when a regulation allows the employee discretion, it must be presumed that the employee's acts are grounded in policy when exercising that discretion. *Gaubert*, 111 S.Ct. at 1274. The very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulation. *Gaubert*, 111 S.Ct. at 1274.

The Court recognized that not all agencies issue comprehensive regulations, but indicated that the general aims and policies of the controlling statute will be evident from its text. *Gaubert,* 111 S.Ct. at 1274. For the Plaintiffs' claims to survive the motion to dismiss, the facts must show that the challenged conduct is not the kind of conduct that can be said to be grounded in the regulatory regime. *See Gaubert,* 111 S.Ct. at 1274–75. The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis. *Gaubert,* 111 S.Ct. at 1275.

### 2. The Discretionary Function Exception and the Plaintiffs' First Claim for Relief

Because it has already been determined by Judge Moore that the United States cannot be liable for negligent inspection activities by MSHA inspectors, what remains of the Plaintiffs' First Claim is that MSHA Inspector Marshall was "actively negligent" in providing "technical assistance" to Brad Bourquin concerning the wiring of the McJunkin add-on lighting system to the Joy 12CM 2228. The United States argues that Marshall's conduct involved the permissible exercise of policy judgment concerning how to protect the health and safety of miners. Plaintiffs argue that Marshall had no discretion to give advice that would ultimately result in a violation of MSHA regulations.

Congress enacted the Federal Coal Mine Health and Safety Act of 1969, redesignated the Federal Mine Safety and Health Act in 1977, for the express purpose of protecting the health and safety of coal and other miners. 30 U.S.C. § 801. The regulations promulgated pursuant to this Act established mandatory safety standards intended to protect the health and safety of miners. 30 U.S.C. § 811(a). The Act places the duty of complying with the safety standards on the mine operators and the miners themselves. 30 U.S.C. § 801(e), § 820. MSHA is empowered by statute to monitor mining industry compliance with mine health and safety standards. 30 U.S.C. § 801. MSHA is mandated to make frequent inspections and investigations in coal mines for several purposes. 30 U.S.C. § 813(a).

First, there is no prescription in the text of any MSHA statute, regulation, or policy for a specific course of action for MSHA inspectors to follow with regard to providing technical assistance or advice in the field. The Federal Mine Safety and Health Act does not prescribe a course of action for inspectors to follow in conducting inspections and investigations, but allows them to exercise judgment and choice. 30 U.S.C. § 813(a). Therefore, the first prong of the test from *Berkovitz* is met. Second, if a regulation allows room for employee discretion, it must be presumed that the employee's acts are grounded in policy when exercising that discretion. *Gaubert,* 111 S.Ct. at 1274. Discretionary acts or decisions are protected if based on considerations of public policy. *Berkovitz,* 486 U.S. at 537, 108 S.Ct. at 1959; *Zumwalt,* 928 F.2d at 953.

The court finds three cases instructive because they involve activities similar to those challenged in this case. In *Varig Airlines,* the Federal Aviation Administration had devised a system of "spot checking" airplanes. The Supreme Court held that not only was this act discretionary but so too were the acts of agency employees in executing the program since they had a range of discretion to exercise in deciding how to carry out the spot-check activity. 467 U.S. at 820, 104 S.Ct. at 2767. In *Gaubert,* the claims asserted included that the regulators "gave advice and made recommendations concerning whether, when, and how to place IASA subsidiaries into bankruptcy," "mediated salary disputes between IASA and its senior officers," and "actively intervened ... when the State attempted to install a supervisory agent at IASA." 111 S.Ct. at 1276. The Court found that the statutory provisions relevant to the Defendant agencies were not mandatory, but left to the judgment of the agency the decision of when to institute proceedings against a financial institution

and which mechanism to use. There was no statutory or regulatory mandate which compelled the regulators to act in a particular way. *Gaubert,* 111 S.Ct. at 1277. Each of the challenged actions involved the exercise of the kind of choice and policy judgment that the discretionary function exception was designed to shield. *Gaubert,* 111 S.Ct. at 1278. In *Barnson v. United States,* 816 F.2d 549, 553 (10th Cir.), *cert. denied,* 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987), a decision by the Atomic Energy Commission and Public Health Service not to warn uranium miners of dangers associated with radiation exposure in uranium mines was based on political policy rather than medical considerations and thus was discretionary.

■ After reviewing all of the evidence and applying the law, the court concludes that MSHA Inspector Marshall's technical assistance to Brad Bourquin regarding the wiring of the McJunkin lighting system to the Joy 12CM 2228, albeit incorrect and inadequate, involved the permissible exercise of policy discretion and is protected by the discretionary function exception. *See Ayala,* 877 F.2d at 849. Plaintiffs' First Claim for Relief is therefore barred and must be dismissed.

### B.  Plaintiffs' Second Claim for Relief

An MSHA inspector is mandated to issue a citation with "reasonable promptness" to an operator when the inspector "believes" that an operator has violated the Mine Safety Act. 30 U.S.C. § 814(a). The law of this case is that the United States cannot be held liable for alleged negligent inspection activities by MSHA inspectors, so the Plaintiffs have pursued a claim for knowing and/or intentional failure by MSHA employees to enforce federal mine safety standards. In their Second Claim for Relief, Plaintiffs allege that MSHA inspectors charged with enforcing 30 C.F.R. §§ 57.21–78, 57.21–80, and 75.313 detected violations of those mandatory standards and intentionally and/or knowingly failed to enforce the standards.

### 1.  Evidence of Knowing and/or Intentional Failure to Enforce MSHA Regulations

■ First, the United States argues that the evidence does not show a knowing and/or intentional failure by MSHA inspectors to enforce mandatory safety standards. Although the Plaintiffs have redesigned their Second Claim for Relief more than once, the court agrees that the evidence at trial fell short of establishing MSHA's knowing and/or intentional failure to enforce mandatory safety standards.

Louis Villegos was not an electrical inspector and had received only basic training in electrical matters. Villegos was uncertain whether the condition of the McJunkin lights on the Joy 12CM 2228 in failing to de-energize was a violation of MSHA regulation. In fact, he was told by Jesus Meraz that Mid–Continent had approval for those lights to operate in that manner. Villegos had been taught to seek assistance when confronted with electrical conditions beyond his expertise. Because he was uncertain whether there was a violation, he did not immediately write a citation, rather he brought the condition to the attention of his supervisor in the Glenwood Springs office, Freeman Staples.

Freeman Staples in turn brought the matter to the attention of his superiors in the Price, Utah office. Although the evidence is somewhat disputed, Staples testified that in February of 1981 Marshall came from Price to investigate. Staples understood that Marshall resolved the problem of the lights on the Joy 12CM 2228.

Because Villegos and Staples were uncertain whether the failure of the lights to de-energize constituted a violation of mandatory safety standards, the court concludes that they did not have the requisite belief such that their failure to issue a citation was a knowing and/or intentional violation of 30 U.S.C. § 814(a).

Neither did the delay before issuing a citation in order to seek advice from the Price office rise to the level of a knowing and/or intentional violation of the standard of "reasonable promptness" from 30 U.S.C.

§ 814(a). The evidence indicated that Villegos promptly told Staples about the condition and that Staples promptly contacted the Price office. Staples indicated that soon thereafter he spoke to Marshall at the Glenwood Springs office and understood that Marshall was handling the problem.

Plaintiffs allege that Marshall came to Mid–Continent to investigate in response to the request by Staples, but Marshall denied that he returned to the mine in February of 1981 to investigate. The court concludes that the evidence of Marshall's activities is not sufficient to show a knowing and/or intentional failure by Marshall to enforce MSHA safety regulations.

The evidence does not show that MSHA employees knowingly and/or intentionally violated 30 U.S.C. § 814(a). Therefore, the Plaintiffs cannot prevail on their Second Claim for Relief.

### 2. Liability Under the FTCA

■ Pursuant to Fed.R.Civ.P. Rule 41(b), the United States moves to dismiss the Plaintiffs' Second Claim for Relief for failure to enforce Mine Safety Act regulations because MSHA's regulatory enforcement activities do not create a duty under Colorado law and the claim is therefore not actionable under the FTCA.

Generally, the FTCA constitutes a waiver of sovereign immunity for certain suits against the government arising from the negligence or wrongful conduct of its employees. *See Dalehite v. United States,* 346 U.S. 15, 17, 73 S.Ct. 956, 958, 97 L.Ed. 1427 (1953). For liability purposes, the FTCA mandates that the government be treated as a private person and specifies that the governing substantive law is the law of the place where the negligent or wrongful conduct occurred. 28 U.S.C. § 1346(b); 28 U.S.C. § 2674; *Aldrich Enterprises, Inc. v. United States,* 938 F.2d 1134, 1138 (10th Cir.1991). Accordingly, Colorado law governs the tort liability inquiry here.

A duty may have its source in either a legislative enactment or in the common law. *Board of County Com'rs. v. Moreland,* 764 P.2d 812, 816 (Colo.1988).

Whether a particular defendant owes a legal duty to a particular plaintiff is a question of law. *University of Denver v. Whitlock,* 744 P.2d 54, 57 (Colo.1987); *Taco Bell, Inc. v. Lannon,* 744 P.2d 43, 46 (Colo. 1987); *Jefferson County School Dist. R–1 v. Justus,* 725 P.2d 767, 769 (Colo.1986).

■ Plaintiffs' allegations are derived from the regulations setting forth the mandatory safety standards for underground coal mines, specifically 30 C.F.R. §§ 57.21–78, 57.21–80, and 75.313. Where specific behavior of federal employees is required by federal statute, liability to the beneficiaries of that statute may not be founded on the FTCA if state law recognizes no comparable private liability. *Zabala Clemente v. United States,* 567 F.2d 1140, 1149 (1st Cir.1977), *cert. denied,* 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978). Even intentional violation of federal regulations does not state a claim actionable under the FTCA unless state tort law imposes an analogous duty on private persons. *Chen v. United States,* 854 F.2d 622, 627–29 (2d Cir.1988).

■ There are certain fields, such as sovereign immunity, in which the courts should leave the establishment of substantive law to the legislative branch. *Evans v. Board of County Com'rs,* 174 Colo. 97, 482 P.2d 968, 972 (1971). Under Colorado law, the absence of a clear expression of legislative intent to allow a civil liability remedy for violations of the Mine Safety Act would preclude recovery by Plaintiffs in this case. *See Moreland,* 764 P.2d at 816–17. If the Colorado legislature intended to impose tort liability upon the government or government officials for failure to enforce federal mine safety standards, then its expression of this intent "should be loud and clear, by authorizing the remedy." *See Quintano v. Industrial Commission,* 178 Colo. 131, 495 P.2d 1137, 1139 (1972). It must be assumed that the specific remedies designated by the legislature exclude all others. *Farmers Group, Inc. v. Trimble,* 658 P.2d 1370, 1378 (Colo.App.1982), *aff'd,* 691 P.2d 1138 (Colo.1984); *Silverstein v. Sisters of Charity,* 559 P.2d 716,

718 (Colo.App.1976); *see Quintano*, 495 P.2d at 1138–39. The fact that no civil remedy was provided against the inspectors for negligently, knowingly, intentionally or otherwise failing to detect violations of federal mine safety standards militates against the imposition of tort liability upon the United States. *See Ayala*, 580 F.Supp. at 526. The United States, by enacting coal mine safety standards that make mine operators primarily responsible for preventing unsafe and unhealthful conditions, does not thereby become an insurer for the neglect of others because it failed to enforce compliance with such standards. *See Ayala*, 580 F.Supp. at 526.

This court concludes that there is no tort duty created under Colorado law for MSHA's failure to enforce 30 C.F.R. §§ 57.21–78, 57.21–80, or 75.313. Accordingly, the Plaintiffs' Second Claim for Relief must be dismissed.

### 3. The Discretionary Function Exception and Plaintiffs' Second Claim for Relief

Finally, the United States moves to dismiss pursuant to Fed.R.Civ.P. 41(b) on the grounds that even if there were a tort duty upon which the Plaintiffs could base recovery, the discretionary function exception bars Plaintiffs' Second Claim for Relief. The court agrees.

■ The court concludes that the decisions by Villegos to seek the assistance of his supervisor and by Staples to seek assistance from the Price office involved the permissible exercise of policy judgment protected by the discretionary function exception to the FTCA. Villegos and Staples acted pursuant to MSHA policy for resolving technical electrical matters beyond the expertise of its regular inspectors. Indeed, the use of the term "believes" in 30 U.S.C. § 814(a) implies that inspectors exercise judgment or choice in formulating their belief. *See Gaubert*, 111 S.Ct. at 1274–75. And, although Marshall's alleged investigation and advice may have been inadequate and incorrect, his alleged actions also in-

volved the permissible exercise of policy judgment protected by the discretionary function exception to the FTCA.

Because the evidence fails to show that the conduct of MSHA's inspectors is not the kind of conduct grounded in regulatory policy, *see Gaubert*, 111 S.Ct. at 1274–75, the court concludes that the failure by MSHA inspectors to issue a citation pursuant to 30 U.S.C. § 814(a) involved the permissible exercise of policy discretion and is protected by the discretionary function exception. Therefore, the Plaintiffs' Second Claim for Relief is barred and must be dismissed.

IT IS, THEREFORE, ORDERED:

1.  Plaintiffs' Motion to Amend Complaint to Conform to Evidence is DENIED.

2.  Plaintiffs' First Claim for Relief is DISMISSED.

3.  Plaintiffs' Second Claim for Relief is DISMISSED.

4.  This civil action is DISMISSED.