Patsy AYALA, Plaintiff–Appellant,

and

Donna M. Ayala, et al., Plaintiffs,

v.

The UNITED STATES of America,
Defendant–Appellee.

Patsy AYALA, et al., Plaintiffs–
Appellants,

v.

The UNITED STATES of America,
Defendant–Appellee.

Nos. 91–1340, 91–1390.

United States Court of Appeals,
Tenth Circuit.

Nov. 25, 1992.

Jean E. Dubofsky of Dubofsky & Phelan, Boulder, Colo., and David W. Griffith, Collbran, Colo. (Mari C. Bush of Williams & Trine, Boulder, Colo., with them on the brief), for plaintiffs-appellants.

Robin D. Smith, Trial Atty., Torts Branch, Civil Div., U.S. Dept. of Justice, Washington, D.C. (Stuart M. Gerson, Asst. Atty. Gen., Civil Div., Michael J. Norton, U.S. Atty., and Phyllis J. Pyles, Asst. Dir. Torts Branch, Civil Div., on the brief), for defendant-appellee.

Before KELLY and McWILLIAMS, Circuit Judges, and BROWN, District Judge.[*]

WESLEY E. BROWN, District Judge.

This action arises out of an explosion in a coal mine on April 15, 1981, near Redstone, Colorado. Fifteen miners were killed in the explosion. The plaintiffs-appellants are relatives of the deceased miners. The sole remaining defendant in the case is the United States. The plaintiffs allege that the United States is liable under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), because the conduct of employees of the Mine Safety and Health Administration ("MSHA") was a cause of the explosion. The district court entered judgment in favor of the United States, and plaintiffs now appeal.

## I. *Jurisdiction.*

■ We first must address whether we have jurisdiction to hear the appeal. This court requested additional briefing by the parties on the issue of jurisdiction in light of a potential problem with the notice of appeal filed by the plaintiffs. The district court dismissed plaintiffs' claims for relief in a final judgment entered on August 9, 1991. Plaintiffs filed a notice of appeal on September 26, 1991. The notice was defective, however, in that it simply listed "Ayala, et al." as the appellants instead of identifying each party seeking to appeal. Normally, the parties taking an appeal must be specifically identified in the notice of appeal in order to confer appellate jurisdiction on this court. Fed.R.App. 3(c); *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988). This first appeal was designated as Tenth Circuit No. 91–1340.

Upon being notified that there was a potential problem with the notice of appeal, the plaintiffs obtained an extension of time from the district court and filed a second notice of appeal naming each of the appellants individually.[1] This second appeal was designated as Tenth Circuit No. 91–1390.

---

[*] The Honorable Wesley E. Brown, Senior United States District Judge for the District of Kansas, sitting by designation.

1. On November 5, 1991, plaintiffs filed a motion for extension of time in the district court pursuant to Fed.R.App.P. 4(a)(5) in order to correct the notice of appeal. The motion was served on all parties. Plaintiffs also informally requested an oral hearing on the motion. The district court granted the motion *ex parte* by written order dated November 7, 1991, and entered in the record on November 12, 1991. The district court found "excusable neglect" warranting an extension of time and determined that oral argument on the motion was not necessary. The plaintiffs thereafter filed the second notice of appeal naming each of the plaintiffs.

The defendant United States has now filed a motion to dismiss case No. 91–1390.[2]

■ We find it unnecessary to address the issues raised by the defendant's motion to dismiss No. 91–1390 because we find that we have jurisdiction to hear the appeal of each plaintiff in 91–1340. It is true that Rule 3(c) of the Federal Rules of Appellate Procedure requires that the notice of appeal "specify the party or parties taking the appeal" and that plaintiffs did not include that information in their first notice of appeal. But "when papers are technically at variance with the letter of [Rule 3], a court may nonetheless find that the litigant has complied with the rule if the litigant's action is the functional equivalent of what the rule requires." *Torres*, 487 U.S. at 316–17, 108 S.Ct. at 2408–09. We have recognized that a docketing statement or other documents filed within the period allotted for filing a notice of appeal may cure defects in the notice of appeal. *See Hubbert v. City of Moore, Okla.*, 923 F.2d 769, 772 (10th Cir.1991). In the instant case, the plaintiffs filed their docketing statement on October 8, 1991. This was within the sixty-day time period they had to file a notice of appeal. Fed.R.App.P. 4(a). The docketing statement identified the parties taking the appeal as "Plaintiffs" and an attachment to the docketing statement specifically listed each of the plaintiffs by name. We find that the plaintiffs' documents, although technically at variance with Rule 3(c), are the functional equivalent of a proper notice of appeal. *Cf. Smith v. Barry*, 502 U.S. ——, 112 S.Ct. 678, 116 L.Ed.2d 678 (1992) (Courts will liberally construe the requirements of Rule 3; informal brief found to be the functional equivalent of a notice of appeal.) The documents, taken together, give fair notice of the specific individuals seeking to appeal and are sufficient to confer jurisdiction on us to hear the appeal. *Cf. Hubbert*, 923 F.2d at 772.

## II. *Facts.*

The following is a summary of the facts found by the district court. *See Ayala v. United States*, 771 F.Supp. 1097 (D.Colo. 1991). The mine in which the April 15, 1981, explosion occurred, the Dutch Creek No. 1 Mine, was owned and operated by Mid–Continent Coal and Coke Company ("Mid–Continent"). A continuous mining machine was used in the mine. This machine mechanically cut into a seam of coal as it proceeded slowly forward. The coal broken loose by the continuous miner was moved by conveyor belt or other device back into the tunnel and transported to the surface. The miner occasionally encountered large pockets of methane gas, called "outbursts," in the seam of the coal. During an outburst, the area in the tunnel around the continuous miner became filled with a highly explosive methane gas and coal dust mixture. Because of the large quantity of methane gas liberated in the Dutch Creek No. 1 Mine, the mine was designated a hazardous mine under MSHA regulations and was placed on a five-day inspection schedule and assigned a resident inspector.

MSHA regulations require electrical equipment, including the continuous miners, to be equipped with a methane monitor. A methane monitor is required to automatically de-energize electrical equipment when the methane gas content in the tunnel reaches a level of two per cent or greater. De-energization is imperative to prevent sparks which, in the presence of a high concentration of methane gas, would cause an immediate explosion. When the methane monitor detects concentrations of methane of two per cent or greater in the surrounding air, it should de-energize the continuous miner by interrupting the power at the continuous miner's control circuit. Only the main power circuit and the methane monitor circuit remain energized so that the methane monitor can continue to operate.

---

2. The United States moves to dismiss No. 91–1390 on the grounds that (1) the district court's extension of time was void *ab initio* because the defendant was not given an opportunity to respond, and (2) the district court erred in finding excusable neglect.

MSHA promulgated standards for illumination in underground coal mines effective July 1, 1978. In order to comply with these standards, it was contemplated that lighting systems would be installed on self-propelled continuous mining equipment. In order to meet this July 1, 1978 deadline, Mid–Continent ordered certain lighting "packages" from the McJunkin Corporation ("McJunkin") for installation on Mid–Continent's continuous mining machines. Addition of the lights constituted a field modification of underground mining equipment which required MSHA approval of a field modification application and an MSHA inspection of the modified equipment before use of the equipment was allowed.

In March of 1978, Brad Bourquin was employed as a mining engineer by Mid–Continent. He was assigned to install the add-on lights to comply with MSHA standards. Bourquin, with the assistance of a McJunkin field technician, completed an application for field modification for the installation of McJunkin lights on a particular Joy Manufacturing Company continuous miner, Serial No. 2228 (hereinafter the "Joy 12CM 2228"). The application prepared by Bourquin included a wiring diagram showing how the lights would be wired to the Joy 12CM 2228.

Jack Marshall was a coal mine electrical inspector employed by MSHA in its Price, Utah, office. On or about June 9, 1978, Marshall assisted Bourquin in preparing a revised application for field modification of the Joy 12CM 2228. On or about June 14, 1978, just as Marshall was ready to return to Price, Bourquin asked Marshall where to connect the add-on lights to the power on the Joy 12CM 2228. Marshall knew that MSHA regulations required the add-on lights to be de-energized by the methane monitor. Marshall told Bourquin to obtain the power by connecting the add-on lights below the main circuit breaker.

The application which Bourquin submitted through Marshall for approval by MSHA of the wiring included a diagram prepared by McJunkin to be used on all different types of mining machines. The McJunkin diagram did not specifically indicate where to connect the lights on the Joy 12CM 2228 to the power. Bourquin prepared a separate diagram with the advice from Marshall about where to connect the lights to the power. The Bourquin diagram showed the lights connected to the power upstream from, or above, the methane monitor relay. Bourquin's diagram was distributed to the electricians in all the Mid–Continent mines to show them how to wire the add-on lights to the continuous miners. Bourquin's diagram was not included with the application submitted for MSHA's approval.

The add-on lights were installed on the Joy 12CM 2228 on or about July 27, 1978. It was the first continuous miner at Mid–Continent on which the add-on lights were installed. It was MSHA's policy that field installations such as the one on the Joy 12CM 2228 were inspected the first time the MSHA inspector was able to do so. On July 27, 1978, electrical inspector Jack Marshall inspected the Bear Creek No. 4 Mine where the Joy 12CM 2228 was then operating.

In May of 1980, following the initial installation of the McJunkin lights, the Joy 12CM 2228 was transferred to the Dutch Creek No. 1 Mine. No relevant changes were made to the machine until April 6, 1981, when a light switch was installed. Mid–Continent employees replaced the old cover plate on an explosion-proof compartment of the Joy 12CM 2228 with a cover plate containing a light switch so that the lights on the machine could be turned on and off manually.[3] The explosion in the Dutch Creek No. 1 mine took place just over one week later.

Evidence subsequently gathered indicated that the explosion in the Dutch Creek No. 1 Mine was caused by an electrical arc within the enclosure housing the light switch on the Joy 12CM 2228. The arc

---

**3.** The add-on lights were apparently so bright that they tended to blind miners working near the machine. At the request of the miners, the cover plate on the explosion-proof compartment housing the Joy 12CM 2228's electrical circuits was replaced with a cover plate containing a light switch so that the lights could be turned on and off.

occurred when the light switch on the machine was turned to the "off" position. Although the enclosure housing the light switch was designed to be "explosion-proof," an investigation revealed that the light switch cover plate on the compartment had been bolted down pinching a piece of wire in the flange of the compartment. This left an opening in the compartment sufficient to allow methane gas to migrate into it. The electrical arc created by the light switch apparently ignited methane within the compartment, causing flame to be expelled through the opening and into the atmosphere outside the compartment, resulting in the explosion.

Tests performed after the explosion indicated that the methane monitor on the Joy 12CM 2228 was working properly. The methane monitor was connected in such a manner, however, that it did not de-activate the McJunkin lighting system when the monitor was activated. The lighting system was not installed in accordance with the approval granted by MSHA because the methane monitor contacts were not wired into the primary circuit of the lighting transformer so as to de-energize the lights. The lights on the Joy 12CM 2228 were wired as illustrated in Bourquin's diagram.

MSHA inspectors made several inspections in Dutch Creek No. 1 Mine between 1978 and April 15, 1981. There were at least two and possibly as many as four MSHA employees who knew or should have known that the McJunkin lights on the Joy 12CM 2228 were wired to the power such that they did not shut off when the methane monitor de-energized the continuous miner.

MSHA Inspector Louis Villegos indicated that he had been in the Dutch Creek No. 1 Mine on or about January 16, 1981 through January 27, 1981, and that he observed that the lights on the Joy 12CM 2228 were not being de-energized by the methane monitor. Villegos spoke to Jesus Meraz, the master mechanic in charge of the mine, about the lights. Meraz told Villegos that the lights had always been this way and led him to believe that someone at MSHA had

approved the operation of these particular lights. Villegos made note of the problem but did not issue a citation. He turned the problem over to Freeman Staples, his immediate supervisor, and took no further action. Villegos left it up to Mr. Staples to determine what to do, reasoning that if someone at MSHA had approved the lights, it was not for him to write a citation. Villegos asked Staples to determine whether anyone at the Price office had approved the lights. Villegos made subsequent inspections of the Joy 12CM 2228, but he no longer activated the methane monitor test button to test the lights because he knew that they were not de-energizing as they should.

Freeman Staples, now deceased, testified by deposition. He indicated he was aware that the lights on the continuous miner were remaining energized. He did not remember who told him about the problem, but he was aware that the situation described by Villegos could be a violation of MSHA regulations. Staples did not order Villegos to issue a citation, but called Price, Utah, and requested that the Price office send an electrical inspector to investigate.

Staples testified that sometime in late February of 1981, electrical inspector Marshall came to the mine to investigate. Staples testified that he asked Marshall if the lights were working properly and that Marshall responded, "No, but they will be after McJunkin makes a little modification." Staples understood that Marshall had taken care of the problem. Marshall, in his deposition testimony, denied that he ever returned to the mine in February of 1981 for the purpose of inspecting the Joy 12CM 2228. He also denied telling Staples that McJunkin would have to make a modification.

III. *Plaintiffs' Claims and the District Court ruling.*

The plaintiffs' Revised Third Amended Complaint set forth two claims for relief. The first claim asserted that Jack Marshall of the MSHA provided incorrect technical advice concerning the wiring of the lights on the continuous miner and that this incor-

rect advice was a cause of the explosion in the Dutch Creek No. 1 Mine. The district court held that this "technical assistance claim" was barred by the discretionary function exception to the Federal Tort Claims Act. *See* 28 U.S.C. § 2680(h).

Plaintiffs' second claim for relief alleged that MSHA employees knowingly or intentionally failed to enforce detected violations of mandatory MSHA safety regulations. After hearing all of the evidence, the district court concluded that the plaintiffs had failed to show that MSHA employees knowingly or intentionally failed to enforce a safety violation. The court further concluded that the second claim for relief was not actionable because MSHA's alleged failure to enforce the regulations did not violate any duty under Colorado law and because the claim was barred by the discretionary function exception.

The plaintiffs attempted to include an allegation in their second claim for relief that MSHA inspectors negligently failed to enforce the regulations. Prior to trial, a magistrate refused to allow plaintiffs to include this allegation on the grounds that it was barred by the law of the case. After the presentation of the evidence, the plaintiffs again sought permission to assert the negligence allegation but were refused by the district court. In addition to the aforementioned rulings, the district court granted summary judgment in favor of the United States prior to trial on three claims asserted by parents of deceased miners.

The plaintiffs contend that each of the foregoing rulings by the district court was in error.

### IV. *The Discretionary Function Exception and Plaintiffs' First Claim for Relief.*

The first argument raised by plaintiffs is that the district court erred in concluding that the discretionary function exception to the FTCA barred plaintiffs' "technical assistance claim." Plaintiffs argue that MSHA Inspector Jack Marshall's incorrect technical advice concerning the wiring of lights on the Joy 12CM 2228 did not involve the exercise of discretion grounded in so-cial, economic, or political policy and was therefore outside the scope of the discretionary function exception. This is the same argument plaintiffs asserted in a prior appeal before this court. *See Ayala v. Joy Manufacturing Co.*, 877 F.2d 846 (10th Cir.1989).

*a. The Discretionary Function Exception.* The Federal Tort Claims Act waives the sovereign immunity of the United States for loss caused by the negligent or wrongful acts of government employees acting within the scope of their employment. 28 U.S.C. § 1346(b). This waiver is limited, however, by the "discretionary function exception," which prohibits any claim against the United States "based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." *Id.* § 2680(a). This exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808, 104 S.Ct. 2755, 2762, 81 L.Ed.2d 660 (1984). It evinces a congressional intent to "prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* at 814, 104 S.Ct. at 2765.

■ Application of the discretionary function exception requires an examination of two factors: whether the challenged act involves an element of judgment or choice, and whether the discretion involved is of the kind that the exception was designed to shield. *Berkovitz v. United States*, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). The most recent Supreme Court case to discuss the discretionary function exception explained these two factors as follows:

> The exception covers only acts that are discretionary in nature, acts that involve an element of judgment or choice, ...

[a]nd it is the nature of the conduct, rather than the status of the actor, that governs whether the exception applies. The requirement of judgment or choice is not satisfied if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow, because the employee has no rightful option but to adhere to the directive.

Furthermore, even assuming the challenged conduct involves an element of judgment, it remains to be decided whether that judgment is of the kind that the discretionary function exception was designed to shield. Because the purpose of the exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort, when properly construed, the exception protects only governmental actions and decisions based on considerations of public policy.

*United States v. Gaubert,* 499 U.S. ——, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) [Quotation marks and citations omitted].

b. *Application of the Exception to the First Claim for Relief.* The district court's determination that it lacked subject matter jurisdiction under the discretionary function exception is a legal issue that we review *de novo. Daniels v. United States,* 967 F.2d 1463, 1464 (10th Cir.1992). Plaintiffs concede that MSHA Inspector Jack Marshall had discretion in deciding whether or not to offer technical advice to Brad Bourquin concerning how to connect the add-on lights. Aplt.Br. at 27 (Marshall "had a choice whether to provide assistance and what type of assistance to provide.") They vigorously dispute, however, the proposition that Marshall's discretion concerning how to connect the lights was of the kind that the discretionary function exception was designed to shield. Plaintiffs argue that the technical advice provided by Marshall was governed by objective principles of electrical engineering and by mandatory MSHA regulations requiring the add-on lights to be de-energized by the methane monitor. As such, they contend,

Marshall's discretion did not involve questions of social, economic or political policy.

The Supreme Court has made clear that not all types of judgment are protected by the discretionary function exception. The limitation of the exception to policy-based decisions was addressed in detail by the Court in *Berkovitz v. United States, supra.* One of the claims alleged by the plaintiffs in that case was that the Division of Biologic Standards ("DBS") had been negligent in issuing a license for an oral polio vaccine that did not comply with DBS safety standards. The Court expressed some confusion as to exactly what the plaintiffs meant by this claim. They may have meant that the DBS issued a license for the vaccine without making a determination that it complied with safety standards. If that were the case, then the discretionary function exception did not bar the claim because the DBS had a clear statutory duty to make such a determination before it licensed the product. On the other hand, the plaintiffs may have meant that the DBS made a determination that the vaccine complied with safety standards, but that the DBS's determination had been incorrect. If this were the case, then "the question turns on whether the manner and method of determining compliance with the safety standards at issue involve agency judgment of the kind protected by the discretionary function exception." *Berkovitz,* 486 U.S. at 545, 108 S.Ct. at 1963. The plaintiffs argued that the DBS's decision did not involve policy judgment because the determination was based on "the application of objective scientific standards," while the government argued that the determination incorporated considerable policy judgment. The Supreme Court ultimately declined to rule on the issue because it had not been adequately addressed; the Court noted, however, that the parties' arguments had framed the issue appropriately. *Id.*

*Berkovitz* makes clear that the application of the discretionary function exception turns upon an examination of the nature of the challenged conduct. The specific allegation asserted by the plaintiffs in this case is that Marshall negligently advised

Brad Bourquin to obtain power for the add-on lights on the Joy 12CM 2228 by connecting the lights just below the main circuit breaker. The district court, in finding that Marshall's conduct was protected by the discretionary function exception, did not address the specific nature of the technical advice given by Marshall. Rather, the court focused on the fact that inspectors had discretion in deciding whether or not to offer technical advice. The plaintiffs, however, are not challenging the broad discretion of MSHA inspectors to give advice. They do not allege that Marshall's decision to offer technical advice was itself an act of negligence. "Rather, the specific technical assistance (i.e. to connect the wires to the wrong terminal in violation of mandatory safety standards) is what is at issue." *Ayala v. Joy Manufacturing*, 877 F.2d 846, 848 (10th Cir.1989). Plaintiffs contend that because the specific topic addressed by Marshall involved the application of objective electrical standards, the choice exercised by Marshall in telling Bourquin where to connect the lights was not a policy-based decision. *Citing Arizona Maintenance Co. v. United States*, 864 F.2d 1497, 1504 (9th Cir.1989) ("If it is a choice to be exercised within established objective safety standards, and the plaintiffs claim negligence in the failure to follow such standards, the discretionary function exception does not apply.")

■ If an inspector chooses to offer technical assistance, are any technical judgments made by the inspector protected by the discretionary function exception? If the exception is to be limited by its underlying purpose, the answer to this question must be no. *Cf. Berkovitz*, 486 U.S. at 537, 108 S.Ct. at 1959 ("The exception, properly construed, ... protects only governmental actions and decisions based on considerations of public policy.") Where the particular decision challenged is not a policy-based decision, there is no reason to provide the government with immunity. In this case, the particular decision being challenged is not Marshall's decision to offer technical advice, but his recommendation of where to connect the lights to the continu-

ous mining machine. *Cf.* Aple.'s Br. at 8 ("When Mr. Bourquin requested Mr. Marshall's assistance in determining where to connect the lights to the machine's existing power supply, he caused the inspector to exercise judgment about both whether to provide the requested assistance and, if so, *where to suggest that the power connection be made.*") (emphasis added).

■ The specific decision being challenged here—concerning where to connect the lights—did not involve any considerations of social, economic, or political policy. Marshall was not called upon to balance considerations of safety or efficiency or economy. *Cf. Varig Airlines*, 467 U.S. at 820, 104 S.Ct. at 2767 (Employees performing aircraft inspection were specifically empowered to make policy judgments regarding the degree of confidence that might reasonably be placed in a given manufacturer, the need to maximize compliance with FAA regulations, and the efficient allocation of agency resources.) The discretion involved in Marshall's decision was governed solely by technical considerations. A mandatory MSHA regulation required that the add-on lights be wired in such a manner that they be de-energized by the methane monitor. It was simply a question of choosing a configuration that would cause this to happen. Either the connection recommended by Inspector Marshall would cause the lights to de-energize or it wouldn't. *Cf. Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988) (The decision of how to design an escape hatch in a military helicopter required the designer to consider factors such as the trade-off between greater safety and greater combat effectiveness.) *See also Daniels v. United States*, 967 F.2d 1463, 1465 (10th Cir.1992) (OSHA Inspector's determination as to what type of safety guard was best was protected by the discretionary function exception.) We fail to see how the determination in this case can be labeled a policy decision. The choice was governed, as plaintiffs contend, by "objective principles

of electrical engineering." [4]   Where the governmental conduct at issue does not involve considerations of public policy, the justification for the discretionary function exception is not present. *Berkovitz,* 486 U.S. at 537, 108 S.Ct. at 1959.   We conclude that Inspector Marshall's advice concerning where to connect the lights was not the kind of judgment that the discretionary function exception was designed to shield.

The government suggests in its brief that Marshall's recommendation to connect the power just below the main circuit breaker was not incorrect but was merely "incomplete."   To support this argument, the government points out that even with the lights connected as suggested by Marshall, an electrician could have made the lights properly de-energize with the addition of a "slave relay" from the methane monitor.   The government also directs attention to the district court's finding that Marshall's instructions were "incorrect and inadequate."

Perhaps if the basis of the plaintiffs' claim had been that Marshall's advice constituted negligence because it was not detailed enough, the claim would have been barred by the discretionary function exception.   Under 30 U.S.C. § 952(b), it is left to the individual MSHA inspector to determine whether and *to what extent* to offer

technical advice.   An inspector's decision to offer limited technical assistance may be a policy-based decision reflecting a need to balance the ultimate goal of safety with the reality of finite agency resources. *Cf. Redmon v. United States,* 934 F.2d 1151 (10th Cir.1991).   Under the facts found by the district court in this case, however, we are clearly not faced with a situation of an inspector offering limited technical assistance.   The court's findings make clear that Marshall's recommendations about where to connect the lights to the power on the Joy 12CM 2228 were incorrect—not because he failed to give further instructions on making the connection—but because he simply confused the Joy 12CM 2228 with another type of continuous miner containing different electrical circuitry:

> Marshall knew that the continuous miner operating in Bear Creek No. 4 Mine (the first continuous miner wired with McJunkins add-on lights) was a Joy 12CM.   But the evidence indicates that when Marshall advised Bourquin where to obtain the power for the add-on lights, Marshall must have been thinking of a Lee Norris continuous miner.   Add-on lights on a Lee Norris miner wired substantially according to Exhibit 7 would have been de-energized because the methane monitor relay on a Lee Norris miner is upstream

---

**4.** The government correctly points out that a decision based on objective standards can also incorporate policy choice.   As an example of this, the government cites *Boyle, supra,* in which the Supreme Court found the design of a helicopter escape hatch to be protected by the exception because the design required the consideration of policy factors.   The government contends that *Boyle* is inconsistent with *Arizona Maintenance, supra,* a Ninth Circuit decision relied upon by plaintiffs.

In *Arizona Maintenance Co. v. United States,* 864 F.2d 1497 (9th Cir.1989), the Ninth Circuit applied the "objective standards" concept found in *Berkovitz* and concluded that when a decision is governed by objective standards it is not a policy-based decision protected by the discretionary function exception.   The plaintiffs in *Arizona Maintenance* claimed that dynamite used for blasting on a construction project had damaged their water system.   They alleged the United States had been negligent in using an amount of dynamite that exceeded "established industry standards." *Id.* at 1504.   The Ninth Circuit concluded that "[i]f it is a choice to be

exercised within established objective safety standards, and the plaintiffs claim negligence in failure to follow such standards, the discretionary function exception does not apply." *Id.*

The Ninth Circuit's application of this rule in *Arizona Maintenance* is somewhat troubling.   The court apparently based its conclusion that the challenged decision involved no policy judgment on the fact that it violated "established industry standards."   As *Boyle* makes clear, however, policy considerations may sometimes be at odds with such standards.   The industry safety standards discussed in *Arizona Maintenance* are themselves policy judgments concerning trade-offs between safety, effectiveness, and economy.

By contrast, the choice in this case of where to connect the lights to the continuous mining machine involved no such trade-offs.   The wiring of the lights had to conform to the mandatory MSHA regulation requiring that the lights be de-energized by the methane monitor.   The choice of how to do that was governed strictly by scientific principles that did not involve policy considerations.

of the main circuit breaker. Marshall specifically recommended 20–amp fuses in the lighting circuit, but these 20–amp fuses were not appropriate in that location on the Joy 12CM 2228. The lights on the Joy 12CM 2228 did not de-energize because ... the methane monitor interrupted the power downstream from the point at which Marshall instructed Bourquin to connect the lights to the power source.

The court concludes that the information and instructions that Marshall provided to Bourquin regarding where to connect the add-on lights to the power supply were incorrect and inadequate. The instructions may have been correct had the lights been installed on a Lee–Norris continuous miner with different circuitry, but were not correct for the Joy 12CM 2228.

*Ayala,* 771 F.Supp. at 1105. There is no doubt from the court's findings that Marshall incorrectly determined that connecting the lights just below the main circuit breaker would allow the lights to be de-energized by the methane monitor.

Because the nature of the conduct being challenged by the plaintiffs in count one is not grounded in the exercise of policy judgment, the discretionary function exception does not bar the claim. Accordingly, the district court's ruling on count one of the complaint must be reversed.[5]

### V. *Second Claim for Relief: The "Failure to Enforce."*

The plaintiffs' second claim for relief was based on an allegation that MSHA employees failed to enforce a mandatory regulation requiring the lights on the Joy 12CM 2228 to be de-energized by the methane monitor. In its initial form the claim alleged that MSHA employees negligently, as well as intentionally and/or knowingly, failed to enforce the regulations. The United States moved to dismiss the claim on the grounds that it was barred by the court's prior dismissal of a claim for negligent inspection of the mine.[6] The motion was submitted to a magistrate, who agreed in part with the United States, finding that the allegations of negligent non-enforcement were barred by the court's earlier ruling. The magistrate noted that the plaintiffs "have previously conceded that the issue of negligence is barred by the law of the case." Aplt.App. Vol. I at 79. The magistrate held that the claim was not barred, however, insofar as it alleged that the employees were not merely negligent in failing to enforce the regulations but that they did so intentionally or knowingly. The United States objected to the magistrate's order but the district court found the order to be "appropriate." Thus, the state of mind of the MSHA employees was considered an element of the plaintiffs' "failure to enforce" claim. After hearing the evidence, the district court determined that plaintiffs failed to show that MSHA inspectors knowingly or intentionally failed to enforce the regulations.

Plaintiffs now make two assertions of error in the ruling on the second claim for relief: first, plaintiffs argue that the magistrate and the court erred in not permitting them to go forward with their claim of negligent non-enforcement; and second, they argue that the court erred in finding that the evidence did not show an "intentional or knowing" failure to enforce the regulations.[7]

---

**5.** The plaintiffs ask that we instruct the district court to enter a judgment of liability in their favor on the first claim for relief. Our ruling on the first claim for relief addresses only the application of the discretionary function exception. We express no opinion as to whether plaintiffs may recover under the facts found by the district court. Numerous issues as to liability—including duty, breach, proximate cause, and damages—remain to be determined by the district court in the first instance.

**6.** The court's prior ruling is found at *Ayala v. Joy Manufacturing,* 580 F.Supp. 521 (1984). In that ruling, the court found that plaintiffs' claim of negligent inspection of the mine should be dismissed because the government owed the plaintiffs no tort duty under Colorado law relating to inspection of the mine. The ruling was not appealed by plaintiffs.

**7.** The district court found three separate reasons for ruling in favor of the United States on the second claim for relief. We find it necessary to address only one of these reasons: the finding

■ Although this first argument is grounded on an assertion that the magistrate's ruling on the negligent non-enforcement claim was erroneous, we see no indication in the record before us that plaintiffs raised any objection to this ruling in the district court. In his ruling, the magistrate concluded that plaintiffs had conceded that the issue of negligence was barred by the law of the case. The defendants filed objections to the magistrate's ruling but the plaintiffs did not. Accordingly, we find that the plaintiffs have waived their right to appeal the magistrate's ruling. *Cf. Niehaus v. Kansas Bar Association*, 793 F.2d 1159, 1164–65 (10th Cir.1986). It follows that the district court's refusal to allow an amendment to the complaint prior to trial on the grounds of "law of the case" was not an abuse of the court's discretion.

■ Plaintiffs also contend that the district court erred in denying their motion to reinsert the negligent non-enforcement claim at the close of the trial. Plaintiffs argued that the issue was tried by the implied consent of the parties and that the pleadings should have been conformed to the evidence. The district court denied plaintiffs' motion. As plaintiffs acknowledge, we review the district court's ruling only for an abuse of discretion. *Hardin v. Manitowoc–Forsythe Corp.*, 691 F.2d 449, 457 (10th Cir.1982). The district court concluded that the issue of negligent non-enforcement was barred by the law of the case and cited, among other things, plaintiffs' failure to appeal the magistrate's ruling. The court further found that the defendant never consented to try the issue and that the defendant would be prejudiced if it were re-inserted after the trial. We see no abuse of discretion in this ruling. The court's findings belie the argument that the defendant consented to try the negligence issue.

■ Plaintiffs next argue that the district court erred in its conclusion that MSHA employees did not knowingly or intentionally fail to enforce the regulations. Plaintiffs argued that the MSHA inspectors were aware that failure of the lights on the Joy 12CM 2228 to de-energize violated a mandatory MSHA regulation, but that they knowingly or intentionally failed to enforce the regulation. Under 30 U.S.C. § 814(a), MSHA inspectors were required to issue a citation with reasonable promptness when they believed a mine operator to be in violation of a mandatory regulation.

The district court's determination of whether the inspectors knowingly or intentionally failed to enforce the regulations is a finding of fact. Rule 52(a) requires us to accept the district court's factual findings unless they are shown to be clearly erroneous. *See* Fed.R.Civ.P. 52(a); *Quezada v. County of Bernalillo*, 944 F.2d 710, 715 (10th Cir.1991). "A finding of fact is 'clearly erroneous' if it is without factual support in the record, or if the appellate court, after reviewing all the evidence, is left with the definite and firm conviction that a mistake has been made." *LeMaire v. United States*, 826 F.2d 949, 953 (10th Cir.1987). "If the district court's account of the evidence is plausible in light of the record reviewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

Plaintiffs attack the district court's findings by asserting that "[t]he court found that Villegos, Staples, and Marshall knew that the failure of the methane monitor to de-energize the add-on lights was a violation of the MSHA regulations." Aplt.'s Br. at 44. Clearly, MSHA inspectors were aware of the fact that the lights were not de-energizing. The court found, however, that both Villegos and Staples were uncertain whether the failure of the lights to de-

that the evidence was not sufficient to show that MSHA Inspectors knowingly failed to enforce a

violation of the regulations.

energize constituted a violation. *Ayala,* 771 F.Supp. at 1108. The court noted that Villegos was not an electrical inspector and had received only basic training in electrical matters. "Villegos was uncertain whether the condition of the McJunkin lights in failing to de-energize was a violation of MSHA regulation[s]." *Id.* Adding to his uncertainty was the fact that he had been told by a Mid–Continent employee that the company had MSHA approval for the lights to operate in that manner. *Id.* Villegos brought the condition to the attention of his supervisor, Freeman Staples, as he had been trained to do. Staples, also uncertain of whether the condition constituted a violation, brought the matter to the attention of his superiors in the MSHA's Price, Utah, office and requested that an inspector be sent to investigate. Staples understood that Jack Marshall of MSHA resolved the problem of the lights on the Joy 12CM 2228. *Id.* The district court summarized its findings as to Villegos and Staples as follows: "Because Villegos and Staples were uncertain whether the failure of the lights to de-energize constituted a violation of mandatory safety standards, the court concludes that they did not have the requisite belief such that their failure to issue a citation was a knowing and/or intentional violation of 30 U.S.C. § 814(a)." There was conflicting evidence as to the role of Marshall in detecting the failure of the lights to de-energize. Staples indicated that Marshall came to Mid–Continent to investigate in response to Staples' inquiry, but Marshall denied that he returned to the mine to investigate. The district court concluded that "the evidence of Marshall's activities is not sufficient to show a knowing and/or intentional failure to enforce MSHA safety regulations." *Id.* at 1109.

The district court findings are not clearly erroneous. As to Villegos and Staples, the court's determination that they did not knowingly fail to enforce the regulations is supported by the record. Testimony from each of these men indicated that they were uncertain whether the condition of the lights constituted a violation of the regulations at least in part because Mid–Continent employees led them to believe that MSHA had either approved the lights or had granted an extension of time to repair them. *See* Appellant's App. Vol.I at 174; Vol. II at 40–41. As to Marshall's involvement, he testified that he could not recall going to Mid–Continent at Staples' request to inspect the equipment nor could he recall being involved in an investigation relating to a complaint about the way the lights were operating.[8] The burden was on the plaintiffs to persuade the court that Marshall more likely than not knowingly failed to enforce the regulations. We cannot say that the district court erred in concluding that plaintiffs failed to meet that burden. There was clearly some support in the record for the court's findings. Because those findings are "plausible in light of the record viewed in its entirety," *Anderson v. Bessemer City, supra,* we affirm the court's ruling on this claim.

## VI. *Summary Judgment on the Claims of Surviving Parents.*

Plaintiffs' final argument concerns the claims of the parents of three of the victims of the mine explosion. The parents presented affidavits and deposition testimony indicating that they had incurred economic loss from the death of their sons. It was undisputed that the parents had already received $40,475 in settlement from other defendants and that the United States was entitled to set off this amount against any damages shown by the parents. In ruling on the United States motion for summary judgment on these claims, the district court stated:

> Counsel for Plaintiffs, to their credit, candidly admit that they do not have any evidence to indicate that the claims of these particular Plaintiffs exceed the amount Defendant is already entitled to set off—that is, $40,475.00. There being no genuine issue as to any material fact regarding the claims of [plaintiffs], sum-

---

**8.** As the Government points out in its brief, Mr. Staples was seriously ill at the time of his deposition and was under the influence of medi- cation. It was up to the district court to determine how much weight to assign to Mr. Staples' testimony.

mary judgment on those claims should be GRANTED.

Aplt.App. Vol. I at 92. The court's memorandum and order indicates that this conclusion was reached after a hearing on the motion for summary judgment. In their brief, plaintiffs now argue that they did not concede the issue of damages. They assert that "either counsel misunderstood the court's question or the court misunderstood counsel's answer." Aplt.Br. at 49. This is apparently a reference to a discussion that took place during the summary judgment hearing. The plaintiffs have not submitted a transcript of that hearing, however, as part of the record on appeal. In the absence of a record of the proceedings below, we cannot say that the district court's determination that plaintiffs' counsel conceded the issue of damages was erroneous. *See McGinnis v. Gustafson,* 978 F.2d 1199 (10th Cir.1992) (Failure to file a required transcript raises an effective barrier to informed appellate review; it leaves this court with no alternative but to affirm the affected ruling). *See also S.E.C. v. Thomas,* 965 F.2d 825, 827 (10th Cir.1992). Accordingly, we affirm the district court's grant of summary judgment in favor of the United States on the claims of Gavin and Sharyn Litwiller, Vernon F. Lincoln, and Hugh W. and Alice B. Pierce.

## *Conclusion.*

*No. 91–1390:* Because we have determined that the initial notice of appeal filed by plaintiffs was sufficient to confer jurisdiction to hear all of plaintiffs' appeals, we DISMISS Appeal No. 91–1390.

*No. 91–1340:* The judgment is REVERSED insofar as the district court ruled that count one of the complaint (the "technical assistance claim") was barred by the discretionary function exception. The judgment is AFFIRMED in all other respects. The case is REMANDED for further proceedings consistent with this opinion.