USCA1 Opinion

 

 United States Court of Appeals For the First Circuit
No. 98-1658 NETTIE SHANSKY, Plaintiff, Appellant, v. UNITED STATES OF AMERICA, Defendant, Appellee. APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Reginald C. Lindsay, U.S. District Judge] Before Selya, Circuit Judge, Gibson,* Senior Circuit Judge, and Lipez, Circuit Judge. Frank Verderame, with whom Laurence G. Tinsley, Jr. and
Plattner Verderame, P.C. were on brief, for appellant. Mary Elizabeth Carmody, Assistant United States Attorney, with
whom Donald K. Stern, United States Attorney, was on brief, for
appellee.
January 8, 1999 ______________
*Hon. John R. Gibson, of the Eighth Circuit, sitting by
designation. SELYA, Circuit Judge. This appeal requires us to revisit
the Federal Tort Claims Act (FTCA), 28 U.S.C. 1346(b), 2671-
2680, and, in particular, its discretionary function exception, 28
U.S.C. 2680(a). We conclude that the district court applied the
exception impeccably and appropriately granted summary judgment on
that basis. The facts, insofar as they pertain to the issues on
appeal, are uncomplicated. Upon departing the Hubbell Trading
Post, a national historic site in Ganado, Arizona, through the so-
called "Northern Exit," plaintiff-appellant Nettie Shansky tripped
over an antique wooden threshold and tumbled down a short flight of
steps. She sustained serious personal injuries in the fall. The Trading Post was originally built in the late 1800s. The National Park Service acquired it in 1967 and rehabilitated it
three years later with a view toward preserving its authenticity. Shansky maintains that, when the Park Service refurbished the
Trading Post, it should have installed a handrail at the Northern
Exit. She brought an FTCA suit against the United States on this
theory, and, although she did not amend her complaint, she later
expanded her thesis to include an allegation that the Park Service
also failed to post adequate warning signs at or near the Northern
Exit. The FTCA is a limited waiver of the federal government's
sovereign immunity. Congress has prescribed a number of situations
in which the waiver will not attach. See 28 U.S.C. 2680. One
relates to claims "based upon the exercise or performance or the
failure to exercise or perform a discretionary function or duty on
the part of a federal agency or an employee of the Government,
whether or not the discretion involved be abused." 28 U.S.C. 2680(a). Invoking this discretionary function exception, the
government sought brevis disposition. The district court obliged. Shansky then prosecuted this appeal. We review de novo the lower
court's determination that the discretionary function exception
controls. See Irving v. United States, ___ F.3d ___, ___ (1st Cir.
1998) (en banc) [No. 96-2368, slip op. at 15]. A familiar analytic framework governs the discretionary
function inquiry. An inquiring court first must identify the
conduct that allegedly caused the harm. See id. at ___ [slip op.
at 15-16]. Here, Shansky spotlights the Park Service's
decisionmaking during the Trading Post's rehabilitation in 1970 as
the culpable conduct, claiming that the Park Service abjured
obvious safety measures. The issue, then, is whether this conduct
is of the nature and quality that Congress, in crafting the
discretionary function exception, sought to shelter from tort
liability. That issue encompasses two questions: Is the conduct
itself discretionary? If so, is the discretion susceptible to
policy-related judgments? See United States v. Gaubert, 499 U.S.
315, 322-23 (1991); Berkovitz v. United States, 486 U.S. 531, 536-
37 (1988); Irving, ___ F.3d at ___ [slip op. at 15-16]. Is the Conduct Discretionary? Shansky endeavors to end the inquiry at the initial stage
by showing that the Park Service had no discretion because existing
policy mandated that it install handrails and warning signs when it
refurbished the premises. She finds succor in a broadly worded
expression of a general policy goal contained in the Park Service's
operating manual to the effect that "[t]he saving of human life
will take precedence over all other management actions." National
Park Service, NPS-28: Cultural Resource Management Guidelines(Guidelines) 46 (July, 1994). But this passage does not
specifically prescribe that any particular safety measure be
employed at any particular place or in any particular facility. To
the contrary, it suggests that the Park Service and its
functionaries will have to make discretionary judgments about how
to apply concretely the aspirational goal embedded in the
statement. Accord Tippett v. United States, 108 F.3d 1194, 1197
(10th Cir. 1997). Statements made at this level of generality do
not satisfy Gaubert's and Berkovitz's specific prescription
requirement. Were the law otherwise, the discretionary function
exception would be a dead letter. The surrounding context in which the cited statement
appears buttresses this conclusion. Shansky plucks the statement
from the Guidelines' description of park stewardship but the
paragraph in which the words appear goes on to note that, even
though the saving of human life is a priority, Park Service policy
"recognize[s] that public use of park resources sometimes involves
elements of risk" and also "recognize[s] the need for management
actions to limit risk to acceptable levels, consistent with
acceptable levels of impact on cultural resources." Guidelines at
46. Consequently, the Guidelines, read as a whole, reinforce the
view that Park Service management has discretion to determine which
risks are "acceptable," and thus to balance, at some level,
concerns for human safety against concerns for preserving the
original qualities of a cultural resource. Shansky next argues, in a related vein, that the Park
Service, at the expense of historic authenticity, took other steps
to make the Trading Post safe (for example, it replaced uneven
floorboards during the reconstruction); and that, having opted for
safety in these respects, the Park Service was somehow obliged to
do more with the Northern Exit. This argument lacks force. Shansky's reference to other safety devices proves nothing, because
the Guidelines, which did not specifically require the Park Service
to install handrails or warning signs at the Northern Exit (or at
any other comparable place, for that matter), gave the Park Service
discretion to make precisely the kind of judgments that Shansky now
assails (balancing competing considerations and opting for safety
over authenticity in some applications, but not in others). The only other evidence of a mandatory policy that
Shansky proffers is a Park Service official's response to a
question posed at his deposition. The questioner asked the
deponent whether he "would agree that the National Park Service
policies and regulations required [the Park Service] to identify
dangers to the public," and the deponent responded affirmatively. From this slender reed, Shansky tries to build an argument that the
Park Service adopted a binding policy to install handrails and
warning signs at the Northern Exit. Setting to one side the
rampant ambiguities inherent in the question and answer, the
argument fails because Shansky has shown merely a Park Service
official's unsubstantiated recollection of an unidentified policy
statement. Although a government official's testimony about the
substance of a putative policy sometimes may assist a court's
understanding of agency practice, see, e.g., Kelly v. United
States, 924 F.2d 355, 360-61 (1st Cir. 1991) (explaining that an
agency official's testimony may be used to aid a court in
deciphering ambiguous regulations and guidelines), testimony that
purports to describe written policies and regulations is no
substitute for the original text. See Valdez v. United States, 56
F.3d 1177, 1179-80 (9th Cir. 1995); cf. Irving, ___ F.3d at __
[slip op. at 29] (explaining that if a witness' statements are
offered to show an agency's policy, the witness must, at a minimum,
reconcile his understanding with the agency's more formal
expressions of policy). For these reasons, we find that the challenged conduct is
discretionary. Is the Discretion Policy-Driven? We turn next to the second half of the Gaubert test. On
this score, Shansky asseverates that the Park Service's actions,
even if discretionary, were not policy-driven. Because the law
presumes that the exercise of official discretion implicates policy
judgments, Shansky cannot prevail on this argument unless she
demonstrates that the decision to forgo handrails and warning signs
was not susceptible to policy analysis. See Gaubert, 499 U.S. at
325; Irving, ___ F.3d at ___ [slip op. at 31-32]. Shansky's effort to make the requisite showing emphasizes
the actual decisionmaking that went into the 1970 retrofitting of
the Trading Post. She insists that nobody in the Park Service
perceived that the Northern Exit posed a danger and, thus, no one
thought about installing handrails or warning signs. Shansky
renewed this emphasis at oral argument, repeatedly asserting that
the discretionary function defense should topple solely because
Park Service officials "failed to consider" the safety issues of
which she complains. Although Shansky marshals some evidence to support her
claim the Park Service apparently did not explicitly consider the
safety vel non of the Northern Exit in 1970 her fact-based
exegesis is beside the point. The subjective intent of government
officials is irrelevant to the discretionary function analysis. See Gaubert, 499 U.S. at 325; Irving, ___ F.3d at ___ [slip op. at
29]. It is therefore of no practical consequence that Park Service
officials failed to mull particular safety issues when they planned
the Trading Post's rehabilitation. See Gotha v. United States, 115
F.3d 176, 180 (3d Cir. 1997) ("The test is not whether the
government actually considered each possible alternative in the
universe of options, but whether the conduct was of the type
associated with the exercise of official discretion.") (citations
and internal quotation marks omitted); Kiehn v. United States, 984
F.2d 1100, 1105 (10th Cir. 1993) (holding that "it is unnecessary
for government employees to make an actual 'conscious decision'
regarding policy factors" for it is "irrelevant whether the alleged
failure . . . was a matter of 'deliberate choice,' or a mere
oversight") (citations omitted); United States v. Richardson, 943
F.2d 1107, 1111 (9th Cir. 1991) (holding that the "discretionary
function exception may apply 'in the absence of a conscious
decision'") (citation omitted). In fine, an inquiring court need
not ask whether government actors decided the point explicitly or
actually discussed it, for the inquiry hinges instead on whether
some plausible policy justification could have undergirded the
challenged conduct. The critical question is whether the acts or
omissions that form the basis of the suit are susceptible to a
policy-driven analysis, not whether they were the end product of a
policy-driven analysis. See Rosebush v. United States, 119 F.3d
438, 444 (6th Cir. 1997). Let us be perfectly clear. We do not suggest that any
conceivable policy justification will suffice to prime the
discretionary function pump. Virtually any government action can
be traced back to a policy decision of some kind, but an attenuated
tie is not enough to show that conduct is grounded in policy. SeeCope v. Scott, 45 F.3d 445, 448-49 (D.C. Cir. 1995). Withal, the
determination as to where one draws the line between a
justification that is too far removed, or too ethereal, or both,
and one that is not, is case-specific, and not subject to
resolution by the application of mathematically precise formulae. In particular, there is no principled basis for superimposing a
generalized "safety exception" upon the discretionary function
defense. A case-by-case approach is required. Of course, case-by-case development has led to some
disarray. Compare George v. United States, 735 F. Supp. 1524,
1533-34 (M.D. Ala. 1990) (holding that a government agency's
failure to warn about submerged alligators has no policy basis)
with Tippett, 108 F.3d at 1197-99 (holding that a failure to warn
or otherwise abate the dangers associated with a charging moose is
grounded in policy); compare also Cope, 45 F.3d at 451-52
(concluding that the discretionary function defense did not vitiate
an alleged failure to warn about hazardous road conditions) withRich v. United States, 119 F.3d 447, 451-52 (6th Cir. 1997)
(concluding that the discretionary function defense trumped an
alleged failure to warn about hazardous road conditions), cert.denied, 118 S. Ct. 1364 (1998). These pererrations cause us to
despair of reconciling all the cases. Be that as it may, the
decisional law yields several unifying principles that inform our
analysis and shed sufficient light to remove this case from the
gray area that suffuses this corner of the law. Here, the government's ultimate policy justification is
that forgoing handrails and warning signs at the Northern Exit was
the product of a broader judgment call that favored aesthetics over
safety. Aesthetic considerations, including decisions to preserve
the historical accuracy of national landmarks, constitute
legitimate policy concerns. See Chantal v. United States, 104 F.3d
207, 212-13 (8th Cir. 1997); Kiehn, 984 F.2d at 1104-05. Indeed,
Shansky does not seriously contest the legitimacy of aesthetic
considerations as an abstract matter. Instead, her main theme with a few variations, as we shall see is that when safety
becomes an issue, all else must yield. We cannot embrace so
sweeping a proposition. See Irving, ___ F.3d at ___ n.13 [slip op.
at 34 n.13] (warning courts to hesitate before imposing a principle
of zero tolerance for any kind of risk, absent an express
congressional or administrative command). Congress instructed the Park Service to endeavor "to
conserve the scenery and the natural and historic objects" of the
property in its charge "and to provide for the enjoyment of the
same in such manner and by such means as will leave them unimpaired
for the enjoyment of future generations." 16 U.S.C. 1. At the
very least, this means that the Park Service may balance aesthetic
concerns with those of visitor safety in reaching planning
decisions, and that safety concerns will not automatically eclipse
all other policy considerations. See Chantal, 104 F.3d at 212;
Kiehn, 984 F.2d at 1104. There is nothing anomalous about this
sort of balancing. We live in a world of incommensurable, often
conflicting values. Some might prefer to sacrifice history to
prevent even infinitesimal risks, whereas others might accept some
hazards in order to preserve historical artifacts in a pristine
state. It would be a much more convenient world if we had a single
metric with which to measure, and thereby prioritize, all values but as long as that luxury eludes us, we must rely upon
policymakers to reconcile the ensuing conflicts. In this instance, the statutory scheme empowers the Park
Service to balance incommensurable values such as safety and
aesthetics, and the Judicial Branch is ill-equipped to rework that
balance. See United States v. S.A. Empresa de Viacao Aerea Rio
Grandense (Varig Airlines), 467 U.S. 797, 814 (1984); Chantal, 104
F.3d at 212. We think it follows that inquiries into whether a
discretionary act is policy-driven cannot be short-circuited simply
by raising the specter of a general safety exception. In a more refined version of the same argument, Shansky
points to the Park Service's installation of sprinklers, an alarm
system, fire extinguishers, and the like in the reconstructed
Trading Post and posits that, once the Park Service decided to
effectuate some modern safety measures, it became obliged to take
all feasible safety measures. To support this thesis, Shansky
relies primarily on the discussion of a "failure to warn" claim in
Cope v. Scott, 45 F.3d 445 (D.C. Cir. 1995). We believe that
Shansky loads more on Cope than Cope can bear. Cope involved, inter alia, claims asserting negligence in
the construction, maintenance, and installation of warnings
relating to Beach Drive, a road administered by the Park Service. Cope, an accident victim, claimed, among other things, that the
Park Service's failure to install proper warnings at important
points along the road caused his misfortune. Despite the Park
Service's protests, the record showed that it had treated Beach
Drive as a commuter road, not a scenic drive; that it had installed
numerous traffic devices and signs at frequent intervals along the
road (including two "slippery when wet" signs in the immediate area
in which the accident occurred); and that it had erected the signs
in accordance with the manual on Uniform Traffic Control Devices
(the Manual). See id. at 446-47, 451-52. These facts justified a
finding that, with respect to traffic warning devices on Beach
Drive, the Park Service already had made a specific policy decision
to favor safety over aesthetics. See id. at 452 (concluding that
the Park Service had "chosen to manage the road in a manner more
amenable to commuting through nature than communing with it"). Within the context of that priority-setting policy decision, the
only discretion that the Park Service exercised in posting signs
and devices was the discretion provided for in the Manual. See id.at 451. Although that discretion involved safety assessments
regarding, for example, what types of traffic safety devices were
needed and where they should be placed, it did not involve the
exercise of policy-based discretion. See id. at 451-52. This holding falls neatly into a line of cases involving
plaintiffs who challenge official judgments that implicate
technical safety assessments conducted pursuant to prior policy
choices. See, e.g., Ayala v. United States, 980 F.2d 1342, 1348-49
(10th Cir. 1992); Andrulonis v. United States, 952 F.2d 652, 655
(2d Cir. 1991). Such decisions come within a category of objective
professional judgments that, without more, are not readily amenable
to policy analysis. See Berkovitz, 486 U.S. at 545 (indicating
that discretion involving application of "objective scientific
standards" is not policy-based discretion); Kennewick Irrigation
Dist. v. United States, 880 F.2d 1018, 1030 (9th Cir. 1989)
(similar). Thus, to determine whether an action taken in such
circumstances is grounded in policy-based discretion, the operative
distinction is the one between a judgment that embodies a
professional assessment undertaken pursuant to a policy of settled
priorities and a fully discretionary judgment that balances
incommensurable values in order to establish those priorities. Against this backdrop, Cope is readily distinguishable. In this case, unlike in Cope, no directive bound the designers of
the Trading Post rehabilitation to a pre-determined safety policy
that contained established priorities. Moreover, unlike Cope, this
case does not involve technical safety assessments. Rather,
Shansky challenges the initial planning decisions made during the
refurbishment of the Trading Post in 1970 and unlike in Cope,
those decisions, whether or not actually made with policy
considerations in mind, were susceptible to policy analysis. Indeed, they required the unrestrained balancing of incommensurable
values including safety, aesthetics, and allocation of resources typically associated with policy judgments. The short of it is that a commitment to safety in one
area does not oblige an agency to strike the balance in favor of
safety in every other area. Here, for example, the Park Service
legitimately could conclude that whereas sprinklers and alarm
systems were highly desirable regardless of aesthetic impact (given
the dire consequences that might attend their absence and their
relative inconspicuousness), the aesthetic cost of handrails and
warning signs outweighed the predictable safety benefits. Thus,
the installation of fire safety devices does not necessarily compel
the endorsement of handrails or warning signs. We agree with the
Tenth Circuit that "[a] decision that is a component of an overall
policy decision protected by the discretionary function exception
also is protected by this exception." Johnson v. United States,
949 F.2d 332, 338 (10th Cir. 1991) (quoting Zumwalt v. United
States, 928 F.2d 951, 955 (10th Cir. 1991)). As long as the
eschewal of handrails and warning signs was a component of the
initial overall policy decision and everything in this case
suggests that it was the discretionary function exception
protects the Park Service's conduct. The situation might be different, of course, had the Park
Service committed itself to installing handrails and warning signs
throughout the Trading Post, and then neglected the Northern Exit. In such a setting, one might argue that the Park Service's
discretion was cabined by a prior policy judgment. See, e.g.,
Cope, 45 F.3d at 452. But Shansky makes no such argument. She
contends only that the existence of some safety devices
necessitates the installation of all kinds of safety precautions and that contention clearly goes too far. For similar reasons, we reject Shansky's argument that
the Park Service's installation of a handrail at the Northern Exit
subsequent to her mishap proves that the decision to forgo one in
1970 was not policy-based. For purposes of discretionary function
analysis, there is no distinction between an initial balancing of
policy factors and a subsequent balancing of such factors, yielding
a new discretionary judgment, as long as the latter can be
considered to be of the same nature as, or a component of, the
former. Given the facts of this case, the only thing that the
later action evinces is that the Park Service made a subsequent
policy decision to elevate safety over aesthetics. An agency that
has discretion to make policy choices can change its view as to the
proper balance of relevant concerns as time passes and experience
accrues. Finally, Shansky suggests that the Park Service's conduct
does not fall within the discretionary function exception because
there is no link between the aesthetic concerns supporting a
decision not to install a handrail and the safety considerations
that militate the other way. It is true that, in a rare case, the
government's invocation of a policy justification may be so far-
fetched as to defy any plausible nexus between the challenged
conduct and the asserted justification. See, e.g., Duke v.
Department of Agric., 131 F.3d 1407, 1412 (10th Cir. 1997)
(concluding that the government failed to explain or demonstrate
how neglecting to warn campers about the dangers of rolling
boulders at a popular campsite whether by warning signs or in
tourist literature could have been a policy decision). Withal,
such cases invariably involve extreme circumstances, and the
Trading Post renovations fall comfortably outside this niche. The
evidence is undisputed that the Park Service desired to maintain a
quantum of historical accuracy at this much-frequented site; that
the Trading Post historically had no handrails or warning signs at
the Northern Exit; and that no prior injuries had been reported. Although the condition of the Northern Exit may have been dangerous
to a degree, it was not fraught with the same potential peril as,
for example, the camp ground in Duke, where a boulder smashed into
a camper's tent, causing severe brain damage to a six-year old boy. In Duke, recognizing a nexus between the government's inaction and
its asserted policy justifications was deemed untenable. See id. Under the far different circumstances of this case, however,
recognizing a nexus between the Park Service's conduct and its
asserted policy justification is not unreasonable. We need go no further. We are fully persuaded that the
1970 decision not to place handrails or warning signs at the
Northern Exit is and was susceptible to policy analysis. No
more is exigible to satisfy the objective inquiry that Gaubertdemands. Consequently, we are in complete accord with the Eighth
Circuit, which, responding to an analogous claim under hauntingly
similar circumstances, concluded that the discretionary function
defense protected the Park Service's decision to construct a
stairwell in the Gateway Arch in St. Louis, Missouri, without a
handrail or warning sign. See Chantal, 104 F.3d at 210-13.
Affirmed.